IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PETER D. BROWN TRUST, through Thomas Kolter in his capacity as trustee<br><br>        PLAINTIFF,<br><br>v.<br><br>JOHN LEE SHRIVER and JOHN L. SHRIVER REVOCABLE TRUST dated December 28, 1995, through John L. Shriver in his capacity as trustee,<br><br>        DEFENDANT. | CASE NO. |

**COMPLAINT**

Plaintiff the Peter D. Brown Trust (the "Brown Trust"), by its attorneys, Block & Landsman, and as and for its Complaint against Defendant John Lee Shriver ("Shriver") and the JOHN L. SHRIVER REVOCABLE TRUST dated December 28, 1995 ("Shriver Trust") alleges as follows:

**THE PARTIES**

1. Plaintiff Trust is a revocable trust formed under the laws of the state of Florida. Thomas Kolter ("Kolter") is a Trustee of The Brown Trust and brings this action in the name of The Brown Trust.

2. Defendant John Lee Shriver ("Shriver") is a resident of Cambridge, Massachusetts.

3. Defendant John L. Shriver Revocable Trust, dated December 28, 1005, is, upon information and belief, a successor-in-interest to Shriver's interest in Swine Development, LLC and in Shriver's interest in the other ventures at issue in this case.

## JURISDICTION AND VENUE

4. Jurisdiction is proper in the United States District Court pursuant to 28 U.S.C. § 1332, insofar as this action is between citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest or costs.

5. Venue is proper in the Northern District of Illinois because the principle venture at issue in this case was conceived while Kolter was an Illinois resident, and because he was an Illinois resident when many of the actions, agreements and discussions at issue in this case occurred. Certain of the acts and omissions complained of herein occurred within this judicial district.

## FACTUAL ALLEGATIONS

### I. INTRODUCTION AND BACKGROUND.

6. In or about 1981 or 1982, Kolter, who was then living in Chicago, Illinois and Shriver, who was living in Cincinnati, Ohio, met in Chicago.

7. Kolter and Shriver became close friends very quickly. Among other things, in 1982, they purchased a 30-foot sailboat together, which they sailed on Lake Michigan. Shriver was a groomsman in Kolter's wedding in 1985. The Kolters also took vacations with Shriver, including one to Italy and Switzerland.

8. In 1990, Kolter became unemployed and began to investigate new business opportunities. Due to the recent collapse of the Soviet Union, Kolter focused on investment opportunities in hog production facilities in the newly-freed former USSR satellite countries. In that regard, he embarked on a series of visits to Hungary and the Czech Republic to identify prospects.

2

9. In or around 1992 or 1993, Kolter advised Shriver of his interest in business opportunities in the former USSR satellite countries generally, and more particularly his interest in investing in and developing pig farming ventures therein.

10. Kolter had learned that Poland, like the rest of Eastern Europe that had operated under Soviet control since World War II, was operating its swine production facilities using antiquated, 1930s/1940s technology. Kolter saw a massive growth opportunity, and was pleased to have Shriver participate.

11. Also in or around 1993, Kolter and Shriver agreed that the two would investigate and, where appropriate, participate in such pig farming ventures together.

12. In or around 1993, Kolter created The Brown Trust for the purpose of investing in the pig farming venture with Shriver. From its inception through approximately the end of 1997, Shriver was the trustee of The Brown Trust.

13. Originally, this venture was informally organized – that is, a "handshake deal" between and among two old friends, which was later memorialized as discussed herein.

14. Shriver took it upon himself to instruct his counsel to draft the necessary agreements to formalize this arrangement, and to hire an accountant of his choosing, all on terms unknown to Kolter.

15. In January 1994, Shriver incorporated Swine Development, Inc. ("SDI") as an Ohio corporation that was intended as the original corporate entity for him and Kolter to pursue their venture. Later that year, Shriver formed Swine Development Ltd. ("SDL"), an Ohio limited liability company and merged SDI into the new entity, which replaced SDI as the vehicle by which he and Kolter would pursue their venture. Shriver was allocated a 43% ownership

intereste in SDL and The Brown Trust was allocated a 32% ownership interest.

16. Importantly, the SDL Articles of Organization specify the purpose of the limited liability company as follows:

> The purpose of this limited liability company is to engage, directly or through affiliates, in the ownership, development and operation of hog production facilities and other agricultural businesses, within or without the United States.

This same purpose was stated in the SDL Operating Agreement.

17. As reflected in these organizing documents, SDL was specifically intended to develop, own and operate *numerous* hog production facilities and agricultural businesses. Additionally, SDL specifically planned to pursue this purpose both directly and *through affiliates*.

18. As detailed below, SDL did engage in these intended ventures. However, as also detailed below, Shriver intentionally acted to breach his duties as SDL's manager and frustrate the stated purpose of SDL by structuring the contemplated ventures in a way to inure only to his benefit. More particularly, Shriver was instrumental in developing additional hog production facilities and agricultural businesses as contemplated by SDL's organizing documents. Although he has repeatedly acknowledged The Brown Trust's right to an ownership interest in all of these ventures, Shriver has nonetheless refused to distribute to The Brown Trust either the shares to which it is entitled or its share of the proceeds generated by the other facilities. In that regard, Shriver has tortiously interfered with The Brown Trust's economic and business expectations.

**II. THE PARTIES' BUSINESS VENTURES IN POLAND.**

**A. Pol Lean – The First Venture**

19. In 1993, while he was living in Chicago, Kolter met with Epstein Engineering

4

("Epstein"), also located in Chicago, which owned the largest swine slaughterhouse in Poland. Kolter brought Epstein to the attention of Shriver, and they consulted with Epstein regarding their desire to enter the hog farming field in Poland.

20. In that regard, Kolter set up a meeting with representatives of Epstein in Warsaw, Poland and, at some point in 1993, Kolter and Shriver traveled to Warsaw to attend this meeting. Epstein recommended that Kolter and Shriver's venture begin with a small pig farm, learn and develop best practices for operating the facility, and then look to larger farms once they developed sufficient expertise.

21. Epstein had arranged for the group to visit several Polish farms that were to be privatized, for the purpose of considering an investment into one or more such farms. Epstein was interested in purchasing the low-fat, high-quality type of pig that Kolter believed these farms could raise.

22. During the 1993 trip, Kolter and Shriver met Tadeusz Kuczynski ("Kuczynski"), an employee of the Losice Agricultural University ("Losice"), which was attempting to lease a 500-sow pig farm that it owned.

23. Kolter and Shriver decided to form a venture to lease the farm and purchase Losice's entire swine herd, with two other individuals: Kuczynski and Al Penner ("Penner"), an agricultural expert from Nebraska whom Kolter had met on previous trips to Eastern Europe, and whom Kolter had introduced, like Epstein, to Shriver.

24. Accordingly, upon information and belief, Shriver formed a Polish company called Pol Lean Sp. Zoo ("Pol Lean"). Pol Lean was wholly owned by SDL, in which both

5

Kuczynski and Penner had ownership interests.[1]

25. At or around the time that the Pol Lean venture was underway, Kolter began contributing funds to SDL. As Shriver knew, Kolter's investment was intended to make a substantial return for The Brown Trust. By 1995, Kolter had sent to Shriver approximately $267,000. Shriver was aware that the funds Kolter invested constituted the bulk of his savings, which was intended to ultimately fund his retirement and which, at that time, was largely invested in Symantec stock. Having decided to pursue the SDL venture with Shriver, Kolter liquidated his shares of Symantec, and used Shriver, who was a securities broker, to handle the transaction.

26. From time to time during the operation of Pol Lean, Shriver advised Kolter that the small Losice farm was losing money and required substantial additional funds. Shriver allegedly provided such additional funding until, and he has represented to Kolter, his total amount invested surpassed $1,000,000. In connection with these apparent additional investments, Shriver had SDL's counsel prepare amendments to the SDL Operating Agreement reflecting changes in the ownership interests. In particular, Shriver documented apparent ownership interest changes as follows:

    a. As reflected in the First Amendment to the SDL Operating Agreement, dated May 1, 1995, Shriver's ownership interest had increased to 58.01% (from 43%), The Brown Trust's interest had declined to 27.99% (from 32%), and Kuczynski and Penner's interests were reduced to 7% each. As above, Kolter never received any reason or documentation or proof of payment that would explain this modification.

    b. As reflected in the Second Amendment to the SDL Operating Agreement, dated November 7, 1995, Shriver granted both his mother and his step-father a 5.04% ownership interest. In doing so, Shriver reduced his

---

[1] According to the Operating Agreement, Kuczynski and Penner each owned 12.5% of SDL. However, their interests were subsequently diluted and ultimately eliminated.

  interest to 52.10%, reduced The Brown Trust's interest to 25.18%, and reduced both Kuczynski and Penner's interests to 6.29%.

 c. As reflected in the Third Amendment to the SDL Operating Agreement, dated December 29, 1995, Shriver removed his mother and step-father as owners of the LLC, and returned the remaining owners' interests to the percentages reflected in the First Amendment to the SDL Operating Agreement.

 d. As reflected in the Fourth Amendment to the SDL Operating Agreement, dated January 1, 1998, Shriver increased his ownership interest to 72.3635% (up from 58.01%). In doing so, he reduced The Brown Trust's interest to 22.1092% (down from 27.99%) and reduced Penner's interest to 5.5273%. Kuczynski was removed as an owner and, upon information and belief, Shriver assigned Kuczynski's shares to himself.

 e. As reflected in the Fifth Amendment to the SDL Operating Agreement, dated January 1, 2004, Shriver's ownership interest was again increased to 80.511%, while The Brown Trust's interest was further reduced to 18.883% and Penner's interest was cut to 0.604%.

At the time of at least two of these amendments, Shriver was acting as the trustee of The Brown Trust pursuant to fiduciary duties he owed to The Brown Trust.

 27. Throughout this period, SDL failed to disclose that Shriver had no intention on making good on his obligation to ensure that The Brown Trust received payment for its interests in the other pig farm ventures described *infra*. To the contrary, SDL represented that The Brown Trust did have an ownership interest in those ventures, but that the only reason it was not through SDL was because of restrictive ownership requirements under Polish law. This was so even while Pol Lean, which was wholly owned by SDL, maintained an active relationship with the other ventures, such as acting as the manager of a much larger pig farm that Shriver purchased with his wife (described *infra*).

 28. In or around April 2014, The Brown Trust made arrangements to cash out its interest in Pol Lean for the equivalent of $218,000. The Brown Trust did so by transferring its

interest in SDL to Kolter's wife because, according to Shriver, Poland would not recognize The Brown Trust as an owner.  Kolter's wife then exchanged that interest for shares in Pol Lean, which were then redeemed.  The Brown Trust structured this transaction with the understanding, based on representations by Shriver and SDL, that The Brown Trust's interests in the other ventures were secure and did not require its continuing participation in SDL.  Nonetheless, Shriver failed to pay the entire amount he agreed to for The Brown Trust's interest in Pol Lean.  Specifically, there still remains $23,576.76 in principal due The Brown Trust under this transaction.

29. Plaintiff is informed and believes that, at some time prior to January 2004, Shriver transferred some or all of his interest in SDL, as well as in the other ventures described *infra*, to the Shriver Trust.

30. Plaintiff is also informed and believes that the Shriver Trust replaced Shriver with regard to some or all of his management roles in connection with the various ventures described herein.

31. Accordingly, Plaintiff is informed and believes that the Shriver Trust is a successor-in-interest to some or all of Shriver's interest in, and obligations with, the various ventures described herein.  In that regard, the Shriver Trust is a defendant in each cause of action asserted herein along with Shriver.

### B. Pol Ferm - The Second Venture

32. The Pol Lean venture described above was to be the first - and smallest - of several pig farming ventures that SDL would undertake, as evidenced by the above-cited language in the SDL Operating Agreement.

33. For several years, SDL investigated the possibility of directly purchasing a larger pig farm as part of SDL's "planned expansion" that was entirely consistent with SDL's purpose as described in its organizing documents. For example, in 1997-1998, SDL was looking into the purchase of additional farms, including one in Miaczyn for $500,000 through a new entity to be called Pol-Lean II Sp. Zoo. In addition, they looked into several possible funding sources, including the European Bank for Reconstruction and Development as well as Global Securities a Canadian company owned by an acquaintance of Kolter.

34. In or about 2002 or 2003, SDL continued its effort for planned expansion by acquiring a much larger pig farm in Poland in a venture with Smithfield Foods, one of the largest producers of pork-related food products in the world. Specifically, the plan was to purchase and modernize such a large farm, under which Smithfield Foods would own the pigs (5000 sows), and a Pol Lean-related entity would own the facilities.

35. Shriver advised Kolter that he had looked into the matter, and it turned out that Polish law required that Polish citizens own a majority interest in any such land-owning business in Poland. That law was not an issue with regard to the smaller Pol Lean farm because it was rented, not owned, by Pol Lean. Shriver further advised Kolter that his wife, who was a Polish citizen, could nominally own a majority of the larger farm in order to satisfy the ownership requirements under the law.

36. Upon information and belief, this operation was formed by Shriver, and named Pol Ferm Sp. zoo (hereinafter "Pol Ferm"). This entity was majority owned by Shriver's wife. Notably, Shriver made *himself* rather than SDL a minority owner of Pol Ferm as part of his plan, on information and belief, to ultimately divert profits away from The Brown Trust.

37. The Pol Ferm farm was financed entirely by Smithfield pursuant to an agreement whereby Smithfield would be repaid from net operating revenues of the farm until the loan was fully paid off in 12 years. A primary operating expense of Pol Ferm was a $100,000 per-year fee paid to Pol Lean to manage the Pol Ferm operations. Thus, Shriver led Kolter to believe that none of the holders of an ownership interest, including The Brown Trust, should expect distributions pursuant to those ownership interests until the Smithfield loan was paid off in or around 2014.

38. Shriver had sent Kolter a draft of the agreement with Smithfield to obtain his input on the details of the deal. In addition, Shriver frequently consulted with Kolter during the time he (Shriver) was negotiating an agreement with Smithfield. Kolter's involvement in assisting Shriver in his negotiations with Smithfield were entirely consistent with Shriver's assurances that The Brown Trust had an interest in the Pol Ferm venture despite the need to have Shriver and his wife be the "nominal" owners.

### C. Pol Gaz – The Third Venture

39. In or around 2004-2006, Shriver and Kolter began discussing ways that they might address various environmental and regulatory issues that Pol-Ferm was experiencing – specifically, its large production of waste materials.

40. The two discussed a plan whereby they would produce biogas and generate electricity therefrom using waste materials from the Pol-Ferm operation, which could solve the above-referenced environmental problems and regulatory issues.

41. Indeed, prior to the formation of this venture, Shriver asked Kolter via telephone whether The Brown Trust wished to participate. Kolter indicated that, of course, it would, and

inquired as to its percentage interest, to which Shriver replied "the same as everything else," or words to that effect.

42. On information and belief, Shriver formed another entity, Pol-Gaz (or a similar name) to hold his interest in the venture.

43. Upon further information and belief, Pol-Gaz was funded, at least in part, by Pol-Lean funds, and operates on Pol-Ferm's property.

44. Upon further information and belief, Pol Gas was incorporated in Poland under the name Biogas Agri Sp. zoo, a polish entity (hereinafter "Biogas"). The stated purpose of Biogas according to Polish business records is as stated above: to produce biogas, using waste generated at the Pol-Ferm operation.

### III. THE BROWN TRUST'S INTEREST IN POL FERM AND POL GAZ IS INDISPUTABLE.

45. Through the years, Shriver repeatedly confirmed to Kolter during their conversations that The Brown Trust had the same interest in the Pol Ferm and Pol Gaz as it had in SDL. On several occasions, Kolter requested that Shriver provide written documentation showing The Brown Trust's interest, but Shriver typically did not respond in writing to these requests. Indeed, Shriver would write to Kolter that he preferred to discuss such matters via telephone rather than email.

46. In or around 2008, Kolter flew to Boston where Shriver was then living to meet with him for the specific purpose of discussing The Brown Trust's interest in Pol Ferm and Pol Gaz. During that meeting, they discussed various aspects of the ventures, including Smithfield's participation in the Pol Ferm farm, the "nominal" ownership of Shriver's wife (pursuant to Polish law), and related matters. During the meeting, Shriver again assured Kolter that The

Brown Trust's interest was the same as its interest in SDL.

47. Shriver's confirmation of The Brown Trust's interest in Pol Ferm and Pol Gaz went beyond the oral representations he repeatedly made to Kolter. For example, he acknowledged the ownership interest to persons other than Kolter, such as in 2005 or 2006, when Shriver met with the then-trustee of The Brown Trust in Fort Myers Beach, Florida, to discuss the various beneficial holdings of The Brown Trust, including Pol-Ferm and Pol Gaz.

48. Shriver took other actions acknowledging The Brown Trust's ownership interest in Pol Ferm and Pol Gaz. For example, in 2009, Kolter decided to start a home warranty company and was required to provide the state regulator with financial statements showing his holdings. Accordingly, he asked Shriver to send him financial statements regarding Pol Lean as well as Pol Ferm and Pol Gaz that he could provide to the regulator. In October 2009, Shriver responded by providing Kolter with income statements from Pol Lean, Pol Ferm and Pol Gaz, which he would not have done if The Brown Trust had no interest in those ventures.

49. Moreover, in early December 2013, Kolter requested an update on the performance of Pol Gaz. On December 12, 2013, Shriver sent Kolter an email stating that he "didn't forget about you. I was supposed to get info about biogas today. Will have in the morning and then will call you."

50. Further, Shriver specifically acknowledged in an October 29, 2014 email to Kolter that The Brown Trust definitely had an interest in Pol Ferm and Pol Gaz. In fact, Shriver admitted in that email that he had verbally confirmed to Kolter The Brown Trust's interest in the past.

51. Accordingly, the fact of The Brown Trust's interest in Pol Ferm and Pol Gaz

12

cannot reasonably be disputed. Yet, Shriver has failed to pay any proceeds to The Brown Trust from these ventures, even though the Smithfield loan was, upon information and belief, paid off in 2014 and revenues from Pol Ferm were available for distribution to those with ownership interests.

## COUNT I
## BREACH OF CONTRACT: POL-FERM

52. The Brown Trust re-alleges and incorporates by reference paragraphs 1 through 51 as if set forth herein.

53. As set forth herein, beginning in 1993, The Brown Trust and Shriver agreed to participate in various pig farming ventures together. This agreement was reflected in the Articles of Organization and the Operating Agreement that Shriver created or caused to be created with respect to SDL.

54. The Pol Ferm venture was created pursuant to that agreement. As described *supra*, Shriver and Kolter agreed that The Brown Trust would own the same percentage of Pol Ferm that it owned of SDL.

55. The Brown Trust has fully performed all its obligations under the oral contract.

56. Shriver has breached the agreement by, among other things: (1) failing to pay The Brown Trust any revenues from the Pol Ferm venture, and (2) failing to document The Brown Trust's interest in the Pol Ferm venture.

57. As a result of Shriver's breach, The Brown Trust has suffered damages in an amount to be determined at trial, but believed to be in excess of $100,000.

## COUNT II
## BREACH OF CONTRACT: POL GAZ

58. The Brown Trust re-alleges and incorporates by reference paragraphs 1 through 51 as if set forth herein.

59. As set forth herein, beginning in 1993, The Brown Trust and Shriver agreed to participate in various pig farming ventures together. This agreement was reflected in the Articles of Organization and the Operating Agreement that Shriver created or caused to be created with respect to SDL.

60. The Pol Gaz venture was created pursuant to that agreement. As described *supra*, Shriver and Kolter agreed that The Brown Trust would own the same percentage of Pol Gaz that it owned of SDL.

61. The Brown Trust has fully performed all its obligations under the oral contract.

62. Shriver has breached the agreement by, among other things: (1) failing to pay The Brown Trust any revenues from the Pol Gaz venture, and (2) failing to document The Brown Trust's interest in the Pol Gaz venture.

63. As a result of Shriver's breach, The Brown Trust has suffered damages in an amount to be determined at trial, but believed to be in excess of $100,000.

## COUNT III
## BREACH OF FIDUCIARY DUTY

64. The Brown Trust realleges and incorporates by reference paragraphs 1 through 51 above as if set forth herein.

65. Shriver owed fiduciary duties toward The Brown Trust as a consequence of his position as trustee of The Brown Trust from 1993 through 1998.

66. Additionally, Shriver owed fiduciary duties toward The Brown Trust as a result of his position as the manager of SDL.

67. Moreover, because The Brown Trust had an ownership interest in Pol Ferm and Pol Gaz, The Brown Trust is informed and believes that Shriver owed fiduciary duties toward The Brown Trust in connection with his ownership of and/or management of Pol Ferm and Pol Gaz.

68. By reason of the actions, representations and omissions of material fact described *supra*, Shriver breached his fiduciary duties to The Brown Trust.

69. The Brown Trust suffered damages as a result of Shriver's conduct.

## COUNT IV
## TORTRIOUS INTERFERENCE

70. The Brown Trust realleges and incorporates by reference paragraphs 1 through 51 above as if set forth herein.

71. A claim for tortious interference with prospective business opportunities or economic advantage are: (1) a valid business relationship or a reasonable expectation by the plaintiff of entering into a valid business relationship, (2) the defendant's knowledge of the plaintiff's expectancy, (3) purposeful interference by the defendant that prevents the plaintiff's legitimate interest from ripening into a valid business relationship, and (4) damages to the plaintiff resulting from such interference.

72. As alleged *supra*, The Brown Trust had a reasonable expectation of entering into a valid business relationship with Pol Ferm and Pol Gaz.

73. Additionally, Shriver was aware of The Brown Trust's expectancy.

74. For the reasons described *supra*, among others, Shriver has purposefully

interfered with The Brown Trust's legitimate interest from ripening into a valid business relationship.

75. The Brown Trust has suffered damages as a result of Shriver's conduct.

## COUNT V
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

76. The Brown Trust realleges and incorporates by reference paragraphs 1 through 51 above as if set forth herein.

77. The elements of a claim for aiding and abetting a breach of fiduciary duty are: (1) that the party whom defendant aided performed a wrongful act that caused an injury, (2) that defendant was aware of his role in providing the assistance, and (3) that defendant knowingly and substantially assisted the violation.

78. Because it possessed an ownership interest in Pol Ferm and Pol Gaz, The Brown Trust was owed fiduciary duties by the ventures.

79. Additionally, because it possessed an ownership interest in SDL, The Brown Trust was owed fiduciary duties by that entity.

80. By virtue of the actions, representations and omissions of material fact described *supra*, SDL, Pol Ferm and Pol Gaz breached their fiduciary duties to The Brown Trust.

81. Shriver's conduct constituted acts or omissions that furthered SDL's, Pol Ferm's and Pol Gaz's breaches of fiduciary duty.

82. Shriver knew, or in the exercise of reasonable care should have known, of his role in providing assistance to SDL, Pol Ferm and Pol Gaz in their breaches of fiduciary duty.

83. Shriver was substantially assisting the breach of fiduciary duty.

84. The Brown Trust has suffered damages as a result of Shriver's conduct.

## COUNT VI
## PARTICIPATION IN BREACH OF FIDUCIARY DUTY

85. The Brown Trust realleges and incorporates by reference paragraphs 1 through 51 above as if set forth herein.

86. The elements of a claim for participation in breach of fiduciary duty are: (1) an act or omission which furthers or completes the breach of trust by a fiduciary, and (2) knowledge at the time that the conduct amounted to a breach of trust, or the legal equivalent of such knowledge.

87. Because it possessed an ownership interest in Pol Ferm and Pol Gaz, The Brown Trust was owed fiduciary duties by the ventures.

88. Additionally, because it possessed an ownership interest in SDL, The Brown Trust was owed fiduciary duties by that entity.

89. By virtue of the actions, representations and omissions of material fact described *supra*, SDL, Pol Ferm and Pol Gaz breached their fiduciary duties to The Brown Trust.

90. Shriver's conduct constituted acts or omissions that furthered or completed SDL's, Pol Ferm's and Pol Gaz's breaches of fiduciary duty.

91. Shriver knew, or in the exercise of reasonable care should have known, that the conduct amounted to a breach of trust, or the legal equivalent of such knowledge.

92. The Brown Trust has suffered damages as a result of Shriver's conduct.

## COUNT VII
## ESTOPPEL

93. The Brown Trust realleges and incorporates by reference paragraphs 1 through 51 above as if set forth herein.

17

94. Equitable estoppel arises when one party has misrepresented a material fact to the other, who injuriously relies on the representation.

95. Promissory estoppel occurs when a party attempts to enforce a promise based on that party's reliance on the promise.

96. The primary distinction between the two estoppel doctrines is that equitable estoppel has the additional element of a knowing misrepresentation of a material fact.

97. As described *supra*, Shriver made misrepresentations and omissions of material fact to The Brown Trust, who relied on those statements to its injury.

98. The Brown Trust has suffered damages as a result of Shriver's conduct.

## COUNT VIII
## ACCOUNTING

99. The Brown Trust realleges and incorporates by reference paragraphs 1 through 51 above as if set forth herein.

100. Shriver is in possession of records and accounts that would reflect the financial performance of Pol Ferm and Pol Gaz, and any payments that were made to owners by those ventures.

101. The Brown Trust has a right to this information based on its ownership interest in these ventures.

102. Without access to these records, The Brown Trust has insufficient information to determine the totality of the amount of money owed to it.

103. Thus, The Brown Trust hereby demands an accounting.

## PRAYER

WHEREFORE, Plaintiff requests an Order and Judgment from the Court in its favor and

against Defendant in an amount to be determined at trial, and for all such other and further relief that the Court determines is just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by a jury of its peers.

Dated: November 15, 2016                            /s/ Laurence M. Landsman
                                                                                    Laurence M. Landsman
                                                                                    Block & Landsman
                                                                                    33 North LaSalle Street, Suite 1400
                                                                                    Chicago, IL  60602
                                                                                    (312) 251-1144
                                                                                    (312) 251-1147 (fax)
                                                                                    Email: Larry@Block-Landsman.com

                                                                                   *Attorneys for Plaintiffs*